# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE RITESCREEN COMPANY, LLC, | : | Civil No. 1:23-CV-00778 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| MICHAEL J. WHITE and | : | |
| FLEXSCREEN LLC, | : | |
| | : | |
| Defendants. | : | Judge Jennifer P. Wilson |

## MEMORANDUM

Before the court is a motion for preliminary injunction filed by Plaintiff, The RiteScreen Company, LLC ("RiteScreen"). (Doc. 6.) The court finds that RiteScreen only meets the required elements for a preliminary injunction on its breach of contract claim for violation of the parties' Confidentiality Agreement. As a result, for the reasons that follow, the court will grant the motion for preliminary injunction in part.

## PROCEDURAL HISTORY

This suit was brought by RiteScreen to remedy allegedly ongoing harms caused by a former employee, Defendant Michael J. White ("White"), and his new employer, Defendant FlexScreen LLC ("FlexScreen"). On May 10, 2023, RiteScreen filed the instant lawsuit alleging claims for violation of the Defend Trade Secrets Act ("DTSA") (Count I), violation of the Pennsylvania Uniform Trade Secrets Act ("PUTSA") (Count II), breach of contract against White only

(Count III), tortious interference with contract against FlexScreen only (Count IV), breach of fiduciary duty against White only (Count V), civil conspiracy (Count VI), unjust enrichment (Count VII), and unfair competition (Count VIII). (Doc. 1.) On May 11, 2023, RiteScreen filed motions for an expedited hearing, expedited discovery, preservation of documents, and a preliminary injunction and temporary restraining order. (Docs. 3, 4, 5, 6.) RiteScreen also filed a brief in support of its motion for injunctive relief. (Doc. 7.)

On May 12, 2023, the court granted RiteScreen's motion to preserve documents. (Doc. 12.) The court then held telephonic status conferences with the parties on May 15, 2023. On the record, counsel expressed their willingness to stipulate to a discovery schedule, but they were unable to reach an agreement regarding the scope of temporary injunctive relief pending a preliminary injunction hearing. Because the parties were unable to agree to the terms of a temporary restraining order, the court ruled on the pending motions.

On May 16, 2023, the court granted the motions for an expedited hearing and expedited discovery, and granted RiteScreen's motion for temporary restraining order ("TRO"). (Doc. 24.) Therein, the court ordered Defendants to: (1) deliver White's devices and accounts to a mutually agreeable third-party forensic examiner; (2) immediately return RiteScreen documents, data, and property to RiteScreen; (3) prohibit possession, misappropriation, use, or

disclosure of RiteScreen's confidential information and trade secrets; (4) directed FlexScreen not to employ White; and (5) required White to abide by the terms of the Covenant Agreement and Confidentiality Agreement.  (*Id*. at 13–14.)[1]  The court also scheduled a preliminary injunction hearing for May 22, 2023, and ordered that the TRO would take effect once RiteScreen posted security in the amount of $125,000, and would remain in effect for fourteen days unless extended pursuant to court order.  (*Id.*)

At the parties' request, the court rescheduled the preliminary injunction hearing to July 13, 2023.  (Doc. 27.)  On June 13, 2023, RiteScreen posted the security required by the TRO.  (Doc. 34.)  On June 30, 2023, Defendants filed briefs in opposition to the motion for preliminary injunction, and RiteScreen filed its reply brief on July 7, 2023.  (Docs. 37, 39, 42.)  The court held the preliminary injunction hearing as scheduled on July 13, 2023.  Thereafter, at the parties' request, the court entered an order extending the TRO until the court ruled on the motion for preliminary injunction.  (Doc. 47.)

## FACTUAL BACKGROUND

RiteScreen is a Florida limited liability company with a principal place of business in Pennsylvania.  (Doc. 1, p. 6.)  White is a resident of South Carolina and is a former employee of RiteScreen.  (*Id.*)  In October 2004, White began working

---

[1] For ease of reference, the court uses the page numbers from the CM/ECF header.

for RiteScreen.  (*Id.* at 11.)  According to an April 16, 2015 email, White was

promoted to Director of Sales for Ritescreen effective on April 5, 2015.  (Pl. Ex.

4.)[2]  In the same email, White was notified that the annual base salary change to

$120,000 was reportedly effective in White's "next pay."  (*Id.*)  Additionally,

RiteScreen's CEO at the time, Randall Iles ("Iles"), sent White a Covenant

Agreement to execute, which contained the non-compete clause at issue.  (*Id.*)  Iles

and White testified that White did not immediately sign the Covenant Agreement.

Rather, White reviewed the Covenant Agreement with his own attorney and

suggested changes.  (*See* Pl. Ex. 3.)  Ultimately, sometime after May 5, 2015,

White signed the Covenant Agreement as proposed by RiteScreen as it was

conveyed to him that if he did not sign the Covenant Agreement, he could not

continue with his employment at RiteScreen.

The Covenant Agreement is dated April 17, 2015, and identifies White as

being "currently employed" as "Director of Sales."  (Pl. Ex. 9, p. 1.)  It further

states that the "term of employment shall (has) commence(d) on the 13th. [sic] day

of June, 2014."  (*Id.* ¶ 3.1.)

Paragraph 6.3 of the Covenant Agreement details the parties' obligations

regarding a severance period, which would be triggered by RiteScreen terminating

---

[2] Numerous exhibits were admitted during the preliminary injunction hearing.  All references to those exhibits are identified as "Pl. Ex. __" or "White Ex. __".

White's employment without cause.  (Pl. Ex. 9, ¶ 6.3.)  Paragraphs 7.1 and 7.2

outlines the parties' expectations regarding confidentiality.  (*Id.* ¶¶ 7.1–7.2.)

Pertinent to the issues presently before the court, Paragraph 7.2 provides:

> During the Period of Employment and for six (6) months thereafter
> . . . the Employee must not disclose, disseminate, divulge, discuss, copy
> or otherwise use, in competition with, or in a manner harmful to the
> interest of [RiteScreen], any confidential information (written or oral)
> respecting any aspect of [RiteScreen's] business.

(*Id.* ¶ 7.2.)  The paragraph continues to define confidential information to include

"information about existing or prospective customers or suppliers, such as

customer and supplier lists, contact information, customer preference or transaction

data, purchasing habits, authority levels, business methodologies, sales history,

pricing and rebate levels, and credit information," among other types of

information.  (*Id.* ¶ 7.2(ii).)

Paragraph 7.3 of the Covenant Agreement details the non-compete clause

providing, in part, as follows:

> During the Period of Employment and for six (6) months thereafter, the
> Employee must not in the United States of America, directly or
> indirectly, whether as an individual . . . or otherwise:
>
> (i) . . . be employed or engaged by or otherwise affiliated or
> associated as a consultant, independent contractor or otherwise
> with, any other corporation . . . or other business entity that is
> engaged in a Competing Business.  For purposes hereof, a
> "Competing Business" is a business engaging principally in the
> manufacturing of assembled window and door screens or screen
> components; or is a sales representative or distributor of window
> and door screens or screen components; provided however, that

> a business principally engaged in manufacturing windows or doors that also manufactures screens for internal use is not a Competing Business;

(*Id.* ¶ 7.3.)

On September 25, 2017, White entered into a Confidentiality Agreement with RiteScreen.  (Pl. Ex. 41.)  Therein, White agreed that he would not disclose Confidential Information "to anyone other than certain employees of [RiteScreen] whose job performance and responsibilities require they need to know the information."  (*Id.* ¶ 1.)  He also agreed not to "access any information, or utilize any equipment, other than what [was] required to do [his] job."  (*Id.* ¶ 2.)  Under its terms, he would not "make any unauthorized transmissions, inquiries, modifications, or purging of data in any Company system.  Unauthorized transmissions include, but are not limited to, removing and/or transferring data from the Company's computer systems to unauthorized recipients, locations or systems."  (*Id.* ¶ 6.)

The Confidentiality Agreement defined "Confidential Information" as "Company information including, but not limited to, current and future operations and operating plans, financial results and forecasts, human resources, employees, market conditions and research, computer systems, and management information."  (*Id.* at Preamble, RITESCREEN_000183.)  The Confidentiality Agreement also provided that White understands that:

Confidential Information includes all analysis, communications, compilations, forecasts, studies or other documents prepared by you during your employment/assignment at [RiteScreen]. Confidential Information does not include any information that is publicly available. Information shall be deemed "**publicly available**" if it becomes a matter of public knowledge or is contained in materials available to the public or is obtained from any source other than [RiteScreen] provided that such source is not to your knowledge prohibited from disclosing such information by a legal, contractual or fiduciary obligation to [RiteScreen] and did not obtain the information from an entity or person prohibited from disclosing such information by a legal, contractual or fiduciary obligation to [RiteScreen].

(*Id.* ¶ 9.) Lastly, the Confidentiality Agreement contains an integration clause that states it "constitutes the entire agreement between the parties hereto with respect to its subject matter, and supersedes all prior agreements and understandings, both oral and written, between the parties hereto with respect to its subject matter." (*Id.* ¶ 21.)

On March 17, 2023, White provided a resignation letter to Christopher Seeboe ("Seeboe"), White's direct supervisor, advising that his last day of employment with RiteScreen would be March 31, 2023. (Pl. Ex. 14.) White began working for FlexScreen in early April, 2023, which RiteScreen asserts was in violation of the Covenant Agreement as FlexScreen is a business competitor. (Doc. 1, ¶ 40.) On April 5, 2023, RiteScreen, through counsel, contacted Defendants and demanded that they honor White's agreements with RiteScreen. (Pl. Ex. 20.) Specifically, RiteScreen sought an end to White's employment at FlexScreen and demanded that Defendants return any of RiteScreen's confidential

information and trade secrets.  (*Id.*)  The parties engaged, through counsel, in discussions regarding White's alleged obligations prior to RiteScreen initiating this litigation.  (Pl. Exs. 20–25.)

White admits that he did not return his company-issued laptop on his final day of employment in violation of the Covenant Agreement, but instead returned it on April 4, 2023.  RiteScreen conducted a forensic review of the laptop and discovered that, in the days and weeks leading up to White's departure, White used a personal USB drive to copy thousands of files that RiteScreen alleges contains its confidential information and trade secrets.  That personal USB device was also turned over to RiteScreen for forensic analysis.  During the preliminary injunction hearing, Michael Canup, an expert in computer forensics retained by RiteScreen, and Brett Creasy, a neutral forensic examiner engaged by all parties, testified regarding the files saved on White's personal USB drive and accessed after he left RiteScreen and began work for FlexScreen.  The parties do not dispute that White transferred files from his RiteScreen laptop onto the USB device.  However, White disputes the purpose of the transfer and reason for accessing files once at FlexScreen.

Evidence was presented that White transferred thousands of files from his RiteScreen laptop to his personal USB device.  (Pl. Exs. 49, 50.)  Some of these files were White's personal files in addition to files he used while working at

8

RiteScreen.  However, of the thousands of files transferred, there was a limited number of files opened by White from the USB device while using his FlexScreen laptop.  (Pl. Ex. 51.)  Of those files, the parties drew the court's attention to eighteen files.  (*Id.* at lines 123–125, 129–130, 131, 159–161, 162–165, 176–179, 189.)  Those files included the "Master Sales Funnel," which was described as a playbook for RiteScreen's business because it contains information about current and potential customers, their businesses, and what is needed from a sales perspective to gain and retain customers.  Seeboe testified that customers and prospective customers provide the information that is included in the Master Sales Funnel.  Of the files that the parties brought to the court's attention, Seeboe testified that all but three of the documents are provided to customers or would be provided if asked.  The Master Sales Funnel, the monthly sales report for December 2022, and the monthly sales performance reporting PowerPoint for December 2022 were strictly internal, confidential RiteScreen documents.  (*See* Pl. Exs. 55, 62, 63.)  All three of these documents were transferred to White's personal USB device and at least the Master Sales Funnel was accessed while he worked for FlexScreen.  (*See* Pl. Ex. 51, at line 131.)

There was also testimony and evidence presented that after White accepted a position with FlexScreen, but prior to his final day at RiteScreen, White set up a meeting for FlexScreen with the Senior Director of Enterprise Supply Chain at

Marvin Windows and Doors to occur once White was employed by FlexScreen. (White Ex. 3.)

## JURISDICTION AND VENUE

This court has jurisdiction under 28 U.S.C. § 1331 because this action arises, in part, under federal law, and under 28 U.S.C. § 1367 because the court has supplemental jurisdiction over the state law claims.  Venue is appropriate under 28 U.S.C. § 1391.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 65 allows a district court to enter a preliminary injunction. To obtain a preliminary injunction, plaintiffs must establish: (1) that they are likely to prevail on the merits of the case; (2) that they would suffer irreparable harm if preliminary injunctive relief were denied; (3) that the harm defendants would suffer from the issuance of an injunction would not outweigh the harm plaintiffs would suffer if an injunction were denied; and (4) that the public interest weighs in favor of granting the injunction.  *Holland v. Rosen*, 895 F.3d 272, 285–86 (3d Cir. 2018) (citing *Del. Strong Families v. Att'y Gen. of Del.*, 793 F.3d 304, 308 (3d Cir. 2015)).  The first two factors are "gateway factors": if the plaintiffs have not established those factors, the court need not consider the last two factors.  *Greater Phila. Chamber of Commerce v. City of Phila.*, 949 F.3d 116, 133 (3d Cir. 2020) (quoting *Reilly v. City of Harrisburg*, 858

F.3d 173, 179 (3d Cir. 2017)).  If the plaintiffs do establish the first two factors,

"[t]he court then determines 'in its sound discretion if all four factors, taken

together, balance in favor of granting the requested preliminary relief.'"  *Id.*

(quoting *Reilly*, 858 F.3d at 179).

A party seeking mandatory injunctive relief that would alter, rather than

preserve, the status quo, "must meet a higher standard of showing irreparable harm

in the absence of an injunction."  *Bennington Foods LLC v. St. Croix Renaissance,*

*Grp., LLP*, 528 F.3d 176, 179 (3d Cir. 2008) (citing *Tom Doherty Assocs., Inc. v.*

*Saban Entm't, Inc.*, 60 F.3d 27, 33–34 (2d Cir. 1995)).  To obtain a mandatory

injunction, the party seeking such an injunction must show "a substantial

likelihood of success on the merits and that their 'right to relief is indisputably

clear.'"  *Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 320 (3d Cir. 2020)

(quoting *Trinity Indus., Inc. v. Chi. Bd. & Iron Co.*, 735 F.3d 131, 139 (3d Cir.

2013)).

A preliminary injunction is "an extraordinary remedy never awarded as of

right."  *Benisek v. Lamone*, 138 S. Ct. 1942, 1943 (2018) (quoting *Winter v. Nat.*

*Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)).  Thus, a preliminary injunction

should only be awarded in the "limited circumstances" where "the movant, by a

clear showing, carries the burden of persuasion."  *Holland*, 895 F.3d at 285.

Ultimately, the decision of whether to issue a preliminary injunction is left to the

sound discretion of the district court.  *Pennsylvania v. President of United States*,
930 F.3d 543, 565 (2019) (citing *Winter*, 555 U.S. at 24).

DISCUSSION

**A. Likelihood of Success on the Merits**

Although RiteScreen pleads eight claims, it devoted most of its briefing and
the entirety of the preliminary injunction hearing asserting its likelihood of success
on the merits of the DTSA, PUTSA, and breach of contract claims.  (*See* Doc. 7,
pp. 21–32.)  Therefore, the court will not analyze whether to issue a preliminary
injunction based on RiteScreen's claims for tortious interference with a contract,
breach of fiduciary duty, civil conspiracy, unjust enrichment, or unfair competition
claims because the court does not have sufficient information or argument on those
claims to properly evaluate the Rule 65 standard.  The court will evaluate only on
the claims actually argued by RiteScreen.

**1.  DTSA and PUTSA**

Under the DTSA, a trade secret includes "all forms and types of financial,
business, scientific, technical, economic, or engineering information" when the
owner of that information "derives independent economic value . . . from not being
generally known to, and not being readily ascertainable through proper means by,
another person who can obtain economic value from the disclosure or use of the
information."  18 U.S.C. § 1839(3).  Under the PUTSA, a trade secret is defined as

12

"[i]nformation, including a formula, drawing, pattern, compilation including a customer list, program, device, method, technique or process" when that information "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use" and "[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  12 PA. CON. STAT. § 5302.

RiteScreen argues that the documents and information contained within those documents that White copied to his personal USB device and took with him upon leaving RiteScreen are trade secrets as defined by the DTSA and PUTSA. (Doc. 7, p. 30.)  RiteScreen asserts that White had access to its trade secrets, which included: "(1) information concerning past, present and prospective business contacts and customers; (2) information relating to sales of products and services; (3) technical and operational information; (4) business plans and information; and (5) internal company information."  (*Id.* at 31.)  In RiteScreen's reply brief and at the hearing, RiteScreen argues that the Master Sales Funnel, for example, contains non-public customer information including RiteScreen's customer base, customer names and contact information, customer order specifications, and pricing.  (Doc. 42, pp. 14–15.)

In opposition, White argues that RiteScreen cannot establish that any of the information allegedly misappropriated is a trade secret as defined in the DTSA and PUTSA.  (Doc. 37, pp. 35–39.)  He asserts that while RiteScreen labels information as a "trade secret," it does not explain why it is a trade secret under the law.  (*Id.* at 36–39.)  White submits that information generally known in the industry, customer information, and pricing and purchasing information are not trade secrets.  (*Id.* at 37–39.)

RiteScreen spends much of its brief and the time at the hearing attempting to prove that it took steps to protect its confidential information and trade secrets and that White misappropriated this information.  (*See id.* at 28–32.)  However, RiteScreen has not established that it is "indisputably clear" that the documents taken by White upon his departure include trade secrets as defined by the DTSA and PUTSA.  RiteScreen's testifying employees acknowledged that the information contained in the documents highlighted to the court was largely provided by customers or internal sales figures.  While sales figures may be confidential, this type of information does not derive "independent economic value" and could be properly obtained through other means.  *See* 18 U.S.C. § 1839(3).  Further, while a "compilation of customer data may qualify as a trade secret if it is not readily obtainable from another source and was generated in such a fashion that it constitutes intellectual property of the owner," RiteScreen has not

14

provided evidence that the files moved to White's personal USB drive were not obtainable from another source.  *See Bro-Tech Corp. v. Thermax, Inc.*, 651 F. Supp. 2d 378, 409 (E.D. Pa. 2009) (citations omitted).  For these reasons, the court finds that RiteScreen has not shown a substantial likelihood of success on the merits and that their right to relief is "indisputably clear" on the DTSA and PUTSA claims.

### 2.  Breach of Contract – The Covenant Agreement

To establish a breach of contract claim under Pennsylvania law, RiteScreen must prove: "(1) the existence of a contract, including its essential terms; (2) the breach of a duty imposed by the contract; and (3) damages."  *Church v. Tentarelli*, 953 A.2d 804, 808 (Pa. Super. Ct. 2008).  While non-compete covenants are permitted under Pennsylvania law, "Pennsylvania courts have historically viewed such covenants as contracts in restraint of trade that prevent a former employee from earning a livelihood, and therefore, have disfavored such provisions in the law."  *Socko v. Mid-Atl. Sys. of CPA, Inc.*, 126 A.3d 1266, 1273–74 (Pa. 2015). Nonetheless, non-compete agreements are enforceable if they are: "(1) ancillary to an employment relationship between an employee and an employer; (2) supported by adequate consideration; (3) the restrictions are reasonably limited in duration and geographic extent; and (4) the restrictions are designed to protect the legitimate interests of the employer."  *Id.* at 1274 (citations omitted).

When a non-compete agreement is executed mid-employment, "it is only enforceable if the employee receives 'new' and valuable consideration." *Id.* at 1275.  Courts have found new and valuable consideration to include a promotion, compensation change to include bonuses, and insurance and severance benefits. *Id.* at 1275 & nn. 7–9 (collecting cases).  However, "the mere continuance of the employment relationship at the time of entering into the restrictive covenant is insufficient to serve as consideration for the new covenant, despite it being an at-will relationship terminable by either party."  *Id.* (citing *Pulse Techs., Inc. v. Notaro*, 67 A.3d 778, 781–82 (Pa. 2013)).

RiteScreen concedes that the Covenant Agreement was executed during White's employment with RiteScreen.  (Doc. 7, p. 33.)  However, RiteScreen argues that it was supported by adequate consideration through an increased salary from $70,000 per year to $120,000 per year, a bonus plan opportunity, and a severance package.  (*Id.* at 33–34; Doc. 42, pp. 10–12.)

White[3] argues that the Covenant Agreement makes no reference to any consideration provided in exchange for entering the agreement, and the stated purpose of the agreement was to "provide clarity" for White's ongoing employment.  (Doc. 37, pp. 24–25.)  He further submits that the Covenant

---

[3] FlexScreen sets forth similar arguments in its brief in opposition.  (Doc. 39, pp. 12–14.) However, because White's brief thoroughly covers the issues, the court will not summarize FlexScreen's arguments here.

Agreement acknowledges that White's is "currently employed" as the "Director of Sales" and his employment commenced on June 13, 2014. (*Id.*) Additionally, White argues that any increase in salary fails to provide adequate consideration because the restrictive covenants were not presented to him until after his increased salary went into effect. (*Id.* at 25.) White also avers that any consideration for bonus opportunities and severance benefits is illusory. (*Id.* at 26.)

The plain language of the Covenant Agreement provides that it was executed nearly one year after White's employment began as Director of Sales. While the emails exchanged between White and Iles indicate that the Covenant Agreement was executed close in time to an increase in White's salary, White correctly points out that the Covenant Agreement does not mention this change in its text. Further, the court does not have sufficient evidence at this point in the litigation to determine whether offering the bonus opportunities and severance pay as consideration was illusory. In sum, the court finds that RiteScreen has not met its burden of showing a substantial likelihood of success on their breach of contract claim as to the Covenant Agreement such that its right to relief is indisputably clear.[4]

---

[4] White sets forth several other arguments regarding why the Covenant Agreement is unenforceable. (Doc. 37, pp. 28–35.) Because the court finds that RiteScreen has failed to meet its burden with respect to White's argument on new and valuable consideration, the court need not address White's remaining arguments.

### 3.  Breach of Contract – The Confidentiality Agreement

In additional to the breach of contract claim regarding the Covenant Agreement, RiteScreen also pursues a breach of contract claim as to the Confidentiality Agreement.  (*See* Doc. 1, ¶¶ 91–94, 96–98.)  However, the parties did not separately address this claim in their briefing or at the hearing, rather, it was referred to in conjunction with the violations of the DTSA and PUTSA, as well as the breach of contract claim for the Covenant Agreement.  Nonetheless, the court will address this claim separately.

No arguments or evidence were presented to suggest that the parties dispute that the Confidentiality Agreement exists and was executed by the parties on September 25, 2017.  No arguments or evidence were presented to suggest that the Confidentiality Agreement is not enforceable.  The court notes that it appears the integration clause at paragraph 21 of the Confidentiality Agreement supersedes the language regarding confidentiality in the Covenant Agreement.  (*Compare* Pl. Ex. 9, ¶ 7.2, *with* Pl. Ex. 41, ¶ 21.)  As a result, the court will address the breach of contract claim as arising solely from the Confidentiality Agreement.

Furthermore, White does not dispute that he took RiteScreen files with him upon his departure and opened certain RiteScreen documents while working for FlexScreen.  The Confidentiality Agreement defines confidential information as "Company information including, but not limited to, current and future operations

and operating plans, financial results and forecasts, human resources, employees, market conditions and research, computer systems, and management information." (Pl. Ex. 41, at Preamble, RITESCREEN_000183.)  The Confidentiality Agreement further provides that: "Confidential Information includes all analysis, communications, compilations, forecasts, studies or other documents prepared by you during your employment/assignment at [RiteScreen].  Confidential Information does not include any information that is publicly available."  (*Id.* ¶ 9.)

The Master Sales Funnel, the monthly sales report for December 2022, and the monthly sales performance reporting PowerPoint for December 2022 were strictly internal, confidential RiteScreen documents.  Thus, the court finds that in accordance with the definitions contained in the Confidentiality Agreement, White's action of copying these three files onto his personal USB device and taking those files with him to FlexScreen establishes that RiteScreen has a substantial likelihood of success on the merits of their breach of contract claim as to the Confidentiality Agreement.

### B. Irreparable Harm

Because the court found that RiteScreen only has a likelihood of success on the merits as to its breach of contract claim for the Confidentiality Agreement, the court need only address whether this breach caused irreparable harm to RiteScreen.

However, the parties did not specifically address whether a breach of the Confidentiality Agreement would cause irreparable harm.

In *Fres-co Systems USA, Inc. v. Hawkins*, 690 F. App'x 72, 75–76 (3d Cir. 2017), the Third Circuit addressed a situation similar to this case. There, the district court found that a former employee would "likely use his specialized and confidential knowledge to the detriment of Fres-co . . . . and [the employee's] interference with Fres-co's client relationship would cause immediate irreparable harm to Fres-co." *Id.* at 76. The Third Circuit agreed with the district court that this was irreparable harm because damages could not be "adequately ascertained or compensated by money damages." *Id.* The Third Circuit reasoned: "Given the substantial overlap (if not identity) between [the employee's] work for Fres-co and his intended work for Transcontinental—same role, same industry, and same geographic region—the District Court was well within its discretion to conclude [the employee] would likely use his confidential knowledge to Fres-co's detriment." *Id.*

The court finds that *Fres-co*'s logic applies here. While the court accepts White's assertion that he no longer has RiteScreen files in his possession (because no evidence to the contrary was presented), the fact remains that he took confidential information upon his departure and would likely use the specialized and confidential knowledge and information at his job at FlexScreen. White's

FlexScreen position has the same qualities and similar responsibilities as his position with RiteScreen, it is in the same industry, and within the same geographic region.  Therefore, the court finds that RiteScreen would suffer irreparable harm if White is permitted to use the confidential information gained at RiteScreen in his position with FlexScreen.

### C. The Last Two Factors

Lastly, the court must determine whether the harm that White and FlexScreen would suffer from the issuance of a preliminary injunction outweighs the harm to RiteScreen without a preliminary injunction, and whether the public interest weighs in favor of granting a preliminary injunction.

The court acknowledges that White is disadvantaged by a preliminary injunction limiting his ability to work for FlexScreen.  However, RiteScreen will continue to be harmed in the absence of a preliminary injunction because it will be unable to protect its confidential information.  Further, the court is concerned that RiteScreen could have an issue with current employees if no action is taken here. Christopher Yankowitch, the current CEO of RiteScreen, testified that current RiteScreen employees have expressed concerns about their employment contracts with RiteScreen and this matter has had a negative effect on morale at the company.  On balance, the harm to White does not outweigh the harm to RiteScreen so long as the duration of the injunction is limited.  In the court's view,

the injunction cannot last indefinitely.  Thus, White's inability to work for FlexScreen can be limited in time so that RiteScreen can protect its interest in its confidential information, but the disadvantage to White will come to an end within a reasonable time period.

Finally, the court finds that the public interest weighs in favor of granting a preliminary injunction.  It is in the public interest to protect against the misappropriation and wrongful use of confidential information in order to discourage unfair business competition.  *See, e.g.*, *Nat'l Bus. Servs. v. Wright*, 2 F. Supp. 2d 701 (E.D.Pa. 1998).

**CONCLUSION**

Accordingly, for the above reasons, the court will grant RiteScreen's motion for preliminary injunction in part as to the breach of the Confidentiality Agreement.  However, the court will require supplemental letter briefing to determine the appropriate duration for the preliminary injunction since the Confidentiality Agreement does not contain a durational limit.  An appropriate order will issue.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Judge
Middle District of Pennsylvania

Dated: August 11, 2023